JUDGE SULLIVAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

RAMESH CHAKRAPANI,

    Defendant.

Civil Action No. 09-cv-

09 CIV 00325

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1. This case involves unlawful insider trading by Ramesh Chakrapani ("Chakrapani" or "Defendant"), a securities professional employed by an international asset manager and financial advisory services firm and registered broker-dealer. The Defendant, a citizen of the United States who resides in London, England, tipped a friend and fellow industry professional with material nonpublic information regarding at least one impending corporate acquisition in advance of its public announcement. This friend ("Tippee 1") then traded securities in his personal account, was responsible for and/or caused trades on behalf of at least two proprietary trading accounts affiliated with his employer, and tipped or traded on behalf of his parents (collectively, "Tippee 2"). Chakrapani was privy to this material nonpublic information by virtue of his employment at the financial advisory services firm. The tippees generated a total of approximately

$3.6 million in illegal profits by trading securities based on material nonpublic information concerning the acquisition.

2. Specifically, Chakrapani had access to material nonpublic information concerning an acquisition of Albertson's, Inc. ("ABS") prior to its public release because ABS retained Chakrapani's financial advisory services firm to serve as its financial advisor in connection with the acquisition. Chakrapani was a member of the team assigned to advise ABS on the acquisition and, therefore, was privy to material nonpublic information regarding the acquisition. Chakrapani passed this information to his friend, who then traded securities in his personal account, was responsible for and/or caused trades on behalf of at least two proprietary trading accounts affiliated with his employer, and tipped or traded on behalf of his parents.

3. Based on the material nonpublic information that Chakrapani passed to them, Chakrapani's tippees illegally traded in the securities of ABS prior to the January 23, 2006 public announcement regarding the acquisition of the company.

4. By knowingly or recklessly engaging in the conduct described in this Complaint, Defendant Chakrapani violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## JURISDICTION AND VENUE

5. The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1], to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties and such other and further relief as the Court may deem just and appropriate.

6. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

7. Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

## DEFENDANT

8. Ramesh Chakrapani, age 33, resides in London, England and is a citizen of the United States. Since 2001, Chakrapani has been employed by a financial advisory services firm, which is a registered broker-dealer in the United States. His current position is Managing Director in the Corporate and Mergers and Acquisitions Advisory group. Chakrapani worked in the firm's New York City office from in or about 2001 through in or about 2008, before transferring to its London office.

## OTHER RELEVANT INDIVIDUALS

9. Tippee 1 is employed as a financial analyst in New York City and is a friend of Chakrapani. Upon information and belief, Tippee 1's employer had at least two proprietary trading accounts (collectively referred to as "Tippee 1's employer's accounts").

10. Tippee 2, collectively, are the parents of Tippee 1 and reside outside of the jurisdiction. Tippee 1 had authority to control the trading in Tippee 2's brokerage account.

3

## FACTS

### Chakrapani Possessed Material Nonpublic Information About the ABS Acquisition

11. Prior to the acquisition, ABS, headquartered in Boise, Idaho, was a supermarket retailer, operating grocery stores across the western United States. ABS common stock was traded on the New York Stock Exchange under the ticker symbol, "ABS." In the six months prior to its announcement on January 23, 2006, that it would be acquired, the daily trading volume in ABS stock averaged 6,056,162 shares and the daily stock price averaged $23.15 per share.

12. In early 2005, ABS retained Chakrapani's financial advisory services firm as a financial advisor to assist during its consideration of strategic alternatives. On July 14, 2005, ABS' board of directors instructed Chakrapani's firm to solicit preliminary indications of interest from potential acquirers.

13. Upon information and belief, Chakrapani's financial advisory services firm agreed to maintain in confidence all information related to ABS' exploration of an acquisition. Further, the firm states on its website that one of its "core principles" is "protecting client confidentiality." Because the financial advisory services firm owed a duty to maintain the confidentiality of information provided to it by its clients, such as ABS, the policies and procedures the financial advisory services firm distributed to employees included policies and procedures mandating that each employee maintain information concerning its clients in strict confidence. In addition, upon information and belief, the financial advisory services firm's policies prohibited employees from using confidential information obtained during the course of employment when trading in their own account, or someone else's account, or disclosing the information to others.

Chakrapani was aware that he owed a duty to maintain the confidentiality of information provided to him and his financial advisory services firm by the firm's clients, including ABS, and to abstain from trading based on that information or disclosing that information to others.

14. Chakrapani's financial advisory services firm assigned Chakrapani as a member of the team advising ABS on the acquisition.

15. As part of his participation on the ABS deal team, Chakrapani learned material nonpublic information about ABS' acquisition and negotiations surrounding it prior to the public announcement, including, but not limited to, the following facts:

   a. On December 12, 2005, Cerberus, a private equity firm, formed a consortium with Supervalu and CVS. The Cerberus-Supervalu-CVS consortium sought to explore a potential acquisition of ABS and commenced its due diligence process.

   b. On December 22, 2005, ABS' board of directors considered and rejected the consortium's proposed acquisition, which offered $20.31 in cash plus 0.182 shares of Supervalu for each ABS share. As of the close of trading on December 22, 2005, the offer was equivalent to approximately $26.20 in cash value, and represented a 12.53% premium over ABS' last closing price of $23.28 per share. The next day, on December 23, the consortium and ABS issued press releases announcing the termination of discussions regarding the potential sale of ABS.

   c. During the following few weeks, discussions between ABS and the consortium were revived, and the consortium worked on a revised proposal. On January 9, 2006, the consortium held a nonpublic kick-off meeting to discuss a renewed and revived acquisition.

## Chakrapani Tipped Tippee 1, who Traded on the Basis of the Material Nonpublic Information about the ABS Acquisition and Tipped or Traded on Behalf of Tippee 2

16. On the evening of January 11, 2006, two days after the January 9 ABS kick-off meeting, Tippee 1 called Chakrapani twice at approximately 7:35 p.m. and approximately 9:52 p.m. Tippee 1 also sent Chakrapani a text message at approximately 9:53 p.m.

17. Early the next day, on January 12, 2006, Tippee 1 called Tippee 2. Immediately after that telephone call, Tippee 1 called a branch office of a brokerage firm which, upon information and belief, was where Tippee 2's stockbroker worked. One minute after that call, Tippee 1 called Tippee 2 again.

18. That same morning, on January 12, 2006, approximately 425 ABS call options were purchased in Tippee 2's personal brokerage account. Tippee 1 also purchased more than 5,600 shares of ABS stock in his personal brokerage accounts later that same morning. In addition, Tippee 1's employer's accounts purchased over approximately 600,000 shares of ABS stock that same day.

19. Later in the day on January 12, 2006, Tippee 1 placed six telephone calls to Tippee 2. Tippee 1 also called Chakrapani on January 12, 2006 at approximately 9:35 p.m.

20. On or about January 13, 2006, Tippee 1's employer's accounts purchased thousands of additional shares of ABS stock.

21. From January 15 to January 16, 2006, Tippee 1 made approximately four phone calls and sent approximately five text messages to Chakrapani.

22. On or about January 17, 2006, Tippee 1's employer's accounts purchased over approximately 700,000 additional shares of ABS stock.

6

23. During the evening of January 17, 2006, at approximately 7:45 p.m., Tippee 1 again called Chakrapani.

24. The next day, on or about January 18, 2006, Tippee 1's employer's accounts purchased thousands of additional shares of ABS stock. That same day, on January 18, 2006, Tippee 1 sent a text message to Chakrapani at approximately 11:16 p.m.

25. In total, from January 12 through January 22, 2006, Chakrapani and Tippee 1 had at least twenty telephone conversations and exchanged at least eighteen text messages during that time period, even though, upon information and belief, Chakrapani was in the Bahamas for part of that time period. Further, from January 12, 2006, through January 18, 2006, Tippee 1's employer's accounts purchased in total approximately 1.5 million shares of ABS stock.

26. On January 19, 2006, the Wall Street Journal published an article citing anonymous sources stating that a consortium of private-equity investors and Supervalu submitted a new bid to acquire ABS at slightly more than $26 per share. That same day, after the close of trading, Chakrapani made approximately four telephone calls to Tippee 1.

27. On Friday, January 20, 2006, ABS issued a press release announcing that it had received a bid from a consortium that had previously submitted an offer for the company in December. ABS common stock closed at $24.11 per share that day.

28. On Monday, January 23, 2006, prior to the opening of trading, ABS, Supervalu, and CVS each issued a press release officially announcing the acquisition of ABS by the consortium at $26.29 per share. That day, ABS common stock opened at

7

$24.85 per share and reached a high of $25.42 per share. As a result of this announcement, ABS common stock closed at $25.42 per share, up 5.43% from the closing price of $24.11 per share on the preceding business day. Further, the volume increased approximately 321% from 10,836,800 shares on January 20, 2006, to 45,578,700 shares on January 23, 2006.

29.  Following the announcement, on January 23 and 24, 2006, Tippee 2 and Tippee 1's employer's accounts closed out of their ABS holdings entirely. Tippee 2 sold approximately 425 call options for actual profits of approximately $73,000. Tippee 1's employer's accounts sold all of its shares of ABS stock for actual profits of over approximately $3.5 million.

30.  On or about February 13, 2006, Tippee 1 closed out of his ABS position in his personal brokerage accounts by selling approximately 5,600 shares of ABS stock earning actual profits of approximately $18,000.

31.  As a result of all of their trading in ABS, Chakrapani's tippees made actual profits of approximately $3.6 million.

32.  The confidential information Chakrapani provided the tippees regarding the ABS acquisition was material. For the foregoing and other reasons, a reasonable investor would have viewed this information as being important to his or her investment decision or a significant alteration of the total mix of information made available to the public.

33.  Chakrapani knew or was reckless in not knowing that the information about the ABS acquisition that he learned in the course of his employment was material and nonpublic, and had been disclosed to him with the expectation that he owed, and

would abide by, a fiduciary duty or similar duty of trust and confidence. By tipping this material nonpublic information about ABS to Tippees 1 and 2, who then traded on the basis of this information, Chakrapani knowingly or recklessly breached this duty.

### Chakrapani and the Tippees Breached Their Duties to Maintain Information in Confidence

34.     ABS hired Chakrapani's financial advisory services firm in connection with its efforts to explore strategic alternatives including the possible sale of the company. Chakrapani's firm assigned him to work on the ABS transaction and, as a result, Chakrapani obtained access to material nonpublic information solely for the purpose of assisting ABS. Accordingly, Chakrapani became a temporary insider and fiduciary of ABS and its shareholders. Chakrapani owed a duty to maintain the confidence of any nonpublic information about ABS' pending transaction that he learned in the course of providing services to ABS and abstain from trading based on that information or disclosing that information to others.

35.     Chakrapani breached his duty to his financial advisory services firm by disclosing material nonpublic information about the ABS acquisition to the tippees.

36.     Tippees 1 and 2, who knowingly or recklessly received from Chakrapani confidential information about the ABS acquisition, assumed the duty to maintain that information in confidence. Upon information and belief, Tippees 1 and 2 knew that Chakrapani, due to his employment and position at the financial advisory services firm, had access to material nonpublic information and that he was under a duty to keep that information confidential. By trading on the basis of this information, Tippees 1 and 2 breached this duty.

9

37. Chakrapani derived a direct or indirect pecuniary benefit or a reputational benefit from disclosing the material nonpublic information to Tippees 1 and 2.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

38. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 37, inclusive, as if they were fully set forth herein.

39. Defendant Chakrapani, by engaging in the conduct described above, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    (a) employed devices, schemes or artifices to defraud;

    (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

40. By engaging in the foregoing conduct, Defendant Chakrapani violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Defendant Chakrapani from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder;

### II.

Ordering Defendant Chakrapani to disgorge the unlawful trading profits from Tippees 1 and 2 derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

### III.

Ordering Defendant Chakrapani to pay a civil penalty pursuant to Section 21A or, in the alternative, Section 21(d)(3) of the Exchange Act [15 U.S.C.§ §§ 78u-1 and 78u(d)(3)]; and

### IV.

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

*/s/ Tami S. Stark*

Daniel M. Hawke
Elaine C. Greenberg
Tami S. Stark (TS-8321)
Mary Etheridge Hansen (ME-9947)
Colleen K. Lynch
Kay B. Lee

Attorneys for Plaintiff

**SECURITIES AND EXCHANGE COMMISSION**
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Dated: January 13, 2009